## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dennis Cordelle B., | Case No. 20-cv-0515 (NEB/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dennis B. seeks judicial review of a final decision by the Commissioner of Social Security that denied his application for supplemental security income (SSI). The case is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 16, 18], which were referred to the undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision, and thus, recommends that Plaintiff's motion be denied and the Commissioner's motion be granted.

## I.   Background

### A.   Procedural History

Plaintiff applied for SSI benefits on March 4, 2016, when he was 29 years old.

(*See* R. 11, 18.)[1]  His application was denied initially and on reconsideration.  (R. 11, 126, 133.)  Plaintiff requested a hearing before an administrative law judge (ALJ), which was granted, and a hearing occurred on September 10, 2018.  (R. 27, 136.)  The ALJ issued a written decision on January 29, 2019, finding Plaintiff not disabled and denying SSI benefits.  (R. 8–19.)  Plaintiff requested review by the Appeals Council (R. 4, 6), and the Appeals Counsel denied review on December 17, 2019 (R. 1).  Plaintiff filed this action on February 14, 2020.

### B.    Relevant Medical Records and Other Evidence

Plaintiff has had epilepsy since childhood.  (R. 55–56, 368, 524.)  His seizures waxed and waned when he was a child but increased in frequency when he was about 20 years old.  (R. 56, 524.)  In 2015, he sought treatment and medication primarily through visits to the emergency department (ED) of the Mayo Clinic Health System in Mankato, Minnesota, as described below.

Plaintiff went to the ED for treatment after having a seizure on April 19, 2015.  (R. 392.)  Plaintiff reported back pain, myalgia, and fatigue.  (*Id.*)  An examination showed no neurologic symptoms such as headache, dizziness, tingling, or weakness.  (*Id.*)  Plaintiff was alert, in no acute distress, cooperative, and oriented to time and place.  (R. 394.)  The ED physician noted risk factors of noncompliance with medication and

---

[1] The administrative record is filed at ECF 15 and includes ECF 15-1 through ECF 15-8.  Page numbers in this Report and Recommendation correspond to the consecutive pagination stamped in the lower right corner of each page of the record.  The Court will cite only to the page numbers, not ECF numbers, in its citations to the administrative record.

alcohol abuse. (R. 392.) The physician encouraged Plaintiff to take his medications as prescribed and stop drinking alcohol. (R. 394.) Plaintiff was discharged home less than an hour after he arrived. (*Id.*)

Plaintiff sought treatment at the ED the following month after having a seizure at home. (R. 384.) Medical personnel witnessed him have another seizure while he was in the ED. (*Id.*) Plaintiff had not taken his seizure medication that morning, and the ED physician noted a history of noncompliance. (*Id.* at 384, 387.) The only symptom noted was a seizure; there was no documentation of dizziness, headache, or fatigue. The diagnosis was a seizure due to medical noncompliance. (R. 387.) Plaintiff declined admission and signed himself out of the ED. (R. 389.) His condition on discharge was stable. (*Id.*) Plaintiff was instructed to follow up with Caroline Baerg within a day or two, but there is no evidence he did so. (*Id.*)

Plaintiff returned to the ED in September 2015 to refill his prescriptions. (R. 379.) The ED physician noted that Plaintiff had presented to the ED a month ago for the same reason and still had no primary doctor. (*Id.*) A month later, in October 2015, Plaintiff returned to the ED because he had again run out of his seizure medications and had no primary doctor. (R. 375.) Plaintiff said he had missed his last three doses of Keppra because of "financial inability." (R. 377.) The ED physician noted he could not give Plaintiff a regular prescription and referred him to the neurology department for follow-up. (*Id.*)

On November 2, 2015, Plaintiff presented at the ED after having a seizure and said he had not refilled his Keppra prescription. (R. 371.) He appeared confused but reported

no other symptoms. (*Id.*) A week later, Plaintiff returned to the ED after having a seizure, and he experienced another seizure and two near-seizures while in the ED. (R. 363, 366.) All systems, including musculoskeletal and neurologic, were negative, although he had bitten his tongue. (R. 363–64.) He was alert, oriented, and not in distress, and he displayed no neurological deficits. (R. 365.) He denied headache, tingling, numbness, weakness, dizziness, back pain, or any sensory deficiencies. (R. 368.) Plaintiff reported "having some difficulty" filling his prescriptions for Keppra and Dilantin because he could not afford them. (R. 363, 367.) He also acknowledged smoking one-and-a-half packs of cigarettes a day and drinking a few beers every other day. (R. 368.)

The single exacerbating factor leading to the seizures was missed medication, and the single risk factor was noncompliance with medication. (R. 363.) The attending physician recommended admission to the hospital, but Plaintiff left against medical advice and before he could be evaluated by a neurologist. (R. 366, 367, 368.) Plaintiff was described as "totally stable." (R. 368.)

When Plaintiff returned to the ED in April 2016 immediately after having two seizures, the ED physician repeated that the exacerbating factor was missed medication, and the risk factor was noncompliance with medication. (R. 345.) Plaintiff had not taken his Keppra for two days. (*Id.*) Plaintiff appeared lethargic but manifested no headache, pain, nausea, or dizziness. (*Id.*) He had bitten his tongue during the seizures. (*Id.*) Plaintiff acknowledged occasional alcohol use and regular tobacco use. (R. 346.) He denied drug use, but lab tests were positive for THC, cocaine, and barbiturates. (R. 347–

4

348.)

Plaintiff's mother completed a Witness of Seizure Activity form on April 19, 2016, in which she described seizures Plaintiff had in 2015. (R. 244.) She said Plaintiff was typically unresponsive and confused for about 15 minutes after a seizure. (*Id.*) Plaintiff's mother completed a Seizure Questionnaire form in September 2016, reporting that Plaintiff sometimes had up to three seizures a day. (R. 281.) She also reported that Plaintiff's medication caused depression and insomnia. (R. 282.) She believed Plaintiff had last seen a provider for medication management on September 7, 2016. (*Id.*) Plaintiff's mother completed another Witness of Seizure Activity form on September 21, 2016, indicating that Plaintiff slept for hours after a seizure and was confused. (R. 284.)

In April 2016, Plaintiff completed a Seizure Questionnaire, on which he estimated he had two or three convulsive seizures and one or two nonconvulsive seizures every month. (R. 246.) He did not answer the question asking when he last saw a physician for seizures or prescriptions. (R. 247.) Plaintiff contemporaneously completed a Function Report, stating he had trouble walking, had to stay in bed due to muscle soreness, and had trouble eating after a seizure. (R. 262.)

Plaintiff moved to Michigan in 2017 and began treatment for alcohol use disorder at St. John Providence Eastwood Clinics. (R. 452.) He left the program with no communication after three months and was discharged. (*Id.*) Several progress notes reflect he did not show for appointments. (R. 454–55, 461.)

Plaintiff resumed care in Minnesota in January 2018 when he fell and broke his tooth after having a seizure. (R. 477.) He had run out of seizure medication the day

before. (*Id.*) The following month, Plaintiff attended a medication management appointment with Dr. Emily Bastyr. (R. 521.) Dr. Bastyr noted Plaintiff had received most of his previous medical care through the ED. (*Id.*) Plaintiff reported smoking a half-pack of cigarettes a day, but he was not interested in cessation at that time. (*Id.*) Dr. Bastyr referred Plaintiff to a neurologist because his epilepsy appeared uncontrolled. (R. 522.)

Plaintiff saw neurologist Dr. Vanessa Tseng the following month. (R. 524.) His mother also attended the appointment and told Dr. Tseng that Plaintiff had 20–30 seizures over his lifetime. (R. 525.) Dr. Tseng recommended that Plaintiff continue with his current medication regimen because he had "relatively good seizure control at this time." (*Id.*) She further recommended that Plaintiff wear an epilepsy monitoring unit (EMU) "to better classify and characterize his seizures" and manage his medications. (R. 526.)

Plaintiff did not attend a scheduled appointment for epilepsy care on April 2, 2018. (R. 473.) There is no indication in the record he followed through with Dr. Tseng's recommendation for an EMU.

### C.    Hearing Testimony

At the hearing on September 10, 2018, Plaintiff testified that he took Keppra and Dilantin for his seizures. (R. 41–42.) He testified he always took his medications as prescribed and denied ever forgetting to take them. (*Id.*) Plaintiff later admitted that he had missed doses when he did not have a ride to the pharmacy. (R. 44.) Plaintiff further testified he has had seizures at least three times while at work: after he graduated from high school, in 2016, and in 2018. (R. 49, 50.) After a seizure, he feels dizzy,

6

lightheaded, and forgetful.  (R. 79.)  He has no appetite, and it takes a day or two to feel like himself again.  (*Id.*)

Plaintiff's mother also testified at the hearing.  In the first nine months of 2018, she estimated she saw Plaintiff have seven seizures.  (R. 57–58.)  Typically, when Plaintiff has a seizure, his arms and legs shake; he cannot communicate; and he is not aware of his surroundings.  (R. 59–60.)  If he is standing, he falls to the ground.  (R. 61.)  He may bite his tongue severely.  (*Id.*)  He is not coherent for "a long time" afterward and sleeps for two days  (R. 63.)  He sometimes has multiple seizures in a day.  (R. 66.)  According to Plaintiff's mother, Plaintiff takes his medications as prescribed.  (R. 66, 78.)

Plaintiff's mother also testified that she saw Plaintiff have about twenty seizures in 2016.  (R. 67.)  In 2017, Plaintiff lived in Michigan, so she did not witness any seizures that year, but a relative there told her that Plaintiff had been hospitalized about six times for seizures.  (R. 70–72.)

In response to a hypothetical question posed by the ALJ, vocational expert Dr. Robert Mosley testified that a hypothetical individual of Plaintiff's age, education, work experience, and limitations could not perform Plaintiff's past work, but could work as an inspector and hand packager, plastics assembler, or electronics assembler.  (R. 81–82.)  When Plaintiff's attorney added an alternative limitation that the individual would have an unpredictable seizure once a month at work, Dr. Mosley responded that would not affect the ability to work.  (R. 84–85.)  Plaintiff's counsel then added that the hypothetical person would not be able to function the rest of the day, would have to leave the jobsite, and would be absent the following day.  (R. 85–86.)  In that case, Dr. Mosley

testified, the person could not maintain competitive employment.  (R. 86.)

### D.    The ALJ's Decision

The ALJ issued an adverse decision on January 29, 2019, concluding that Plaintiff

was not disabled between March 4, 2016, and the date of the decision.  (R. 19.)  The ALJ

utilized the five-step sequential analysis described in 20 C.F.R. § 416.920(a)(4).[2]  At step

one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity

since March 4, 2016.  (R. 13.)  At step two, the ALJ found that Plaintiff had the following

severe impairments: seizure disorder, polysubstance drug use, alcohol use, asthma, and

knee ailments.  (R. 13.)  At step three, the ALJ determined that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 14.)  The ALJ specifically

considered whether Plaintiff's epilepsy met Listing 11.02(A) or (B), but found Plaintiff

did not have seizures occurring at least once a month despite three months of adhering to

prescribed treatment.  (*Id.*)  Plaintiff did not meet sections C or D of the listing because

he was not limited to a marked degree in physical functioning; understanding,

remembering, or applying information; interacting with others; concentrating, persisting

in, or maintaining pace; or adapting or managing himself.  (*Id.*)  The ALJ also concluded

that Plaintiff's impairments did not meet Listing 3.03 (asthma), Listing 1.03

---

[2] The five steps are (1) whether the claimant's work activity was substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(i)–(v).

(reconstructive surgery or surgical immobilization of a major joint), or Listing 1.04

(degenerative disc disease). (*Id.*)

Between steps three and four, an ALJ must determine the claimant's residual

functional capacity (RFC).[3]  20 C.F.R. § 416.920(e).  Here, the ALJ found that Plaintiff

could

> perform a full range of work at all exertional levels but with the following
> limitations: The claimant should never climb ladders, ropes, and scaffolds.
> The claimant should never be exposed to unprotected heights, dangerous
> moving mechanical parts, or operate a motor vehicle.  The claimant should
> avoid exposure to open flames and open bodies of water.  The claimant
> should avoid concentrated exposure to dust, odors, fumes, and pulmonary
> irritants.

(R. 15.)  In making this assessment, the ALJ found Plaintiff's statements regarding the

intensity, persistence, and limiting effects of his symptoms inconsistent with the objective

and subjective medical evidence and with other relevant evidence of record.  (*Id.*)  In

particular, the ALJ described and relied on records documenting Plaintiff's

noncompliance with prescribed medication and recommended treatment; failure to attend

appointments; lack of reported symptoms such as headaches or dizziness; and lack of

observed symptoms such as neurological deficits, speech deficits, impaired motor

function, numbness, weakness, loss of coordination, and sensory deficits.  (*See* R. 16–

17.)  The ALJ placed great weight on the opinions of the disability determination service

consultants, great weight on the opinion of consultative examiner Dr. Kenneth Martens,

---

[3] The RFC assessment is "based on all the relevant medical and other evidence in" the
record.  20 C.F.R. § 416.920(e).  A claimant's RFC "is the most [he] can still do despite
[his] limitations."  20 C.F.R. § 416.945(a)(1).

and little weight on the seizure questionnaires completed by Plaintiff's mother. (R. 17.) The ALJ explained the reasons underlying the weight given to each opinion. (R. 17.)

At step four, the ALJ determined that Plaintiff could not perform his past relevant work as a laborer.[4] (R. 18.) The ALJ thus proceeded to step five of the sequential evaluation, where the ALJ determined Plaintiff could make a successful adjustment to other widely available jobs such as hand packager, plastics assembler, and electronics assembler. (R. 19.) Accordingly, Plaintiff was found not disabled. (*Id.*)

### E.    The Missing Providence Records

Among other things, Plaintiff contends the ALJ should have obtained and considered medical records from St. John Providence Eastwood Clinic. (Pl.'s Mem. at 14 [ECF No. 17].) At the September 2018 administrative hearing, Plaintiff's attorney mentioned the existence of medical records that had not been received from a provider at "Providence." (R. 30.) Counsel mentioned he had asked Providence for the records three times. (R. 30–31.) The ALJ gave counsel an additional 14 days to submit the Providence records and said to let her know if counsel needed anything further. (R. 31.) Counsel said he would try for seven days and send Providence a "sternly worded" request. (*Id.*) If that was not successful, counsel said "I'll request a subpoena of you." (*Id.*) The ALJ responded, "Very good. Just let us know." (*Id.*)

At the end of the hearing, Plaintiff's counsel reiterated, "I'm only going to ask

---

[4] The term "past relevant work" means "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 416.960(b)(1).

them for another week and then I'll just tell them . . . you're in violation of federal law and we'll just tell the judge . . . to subpoena these documents.  So I'll keep you posted on that, Judge."  (R. 89.)

There is no indication in the record that Plaintiff's counsel asked the ALJ to issue a subpoena for the Providence documents or told the ALJ the records were missing.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  This standard requires a court to consider not only evidence that supports the ALJ's decision but also evidence that detracts from it.  *See Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  The Court may not, however, reverse the ALJ's decision simply because "the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings," the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  The claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability, not just the impairment, must have lasted or be expected

11

to last for at least twelve months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

III.   **Discussion**

   A.   **Whether the ALJ Erred by Not Obtaining Additional Medical Records**

   Plaintiff contends the ALJ failed to fully develop the record because the ALJ did not obtain the missing medical records from Providence.  (Pl.'s Mem. at 14.)  It is well-settled that an ALJ must "develop the record fairly and fully," even when an attorney represents the claimant.  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  An ALJ need not obtain additional records, however, "so long as other evidence in the record provides a sufficient basis for the ALJ's decision."  *Hilliard v. Saul*, 964 F.3d 759, 763 (8th Cir. 2020) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)).  Furthermore, a claimant's representative has an affirmative duty to "[a]ct with reasonable promptness to help obtain the information or evidence that the claimant must submit."  20 C.F.R. § 416.1540(b)(1).

   Here, the hearing transcript reveals that it was Plaintiff's counsel, not the ALJ, who dropped the ball.  Plaintiff's counsel told the ALJ he would request the records directly from Providence; counsel did not ask the ALJ to request the records.  Counsel also told the ALJ that if Providence did not respond to his direct request, he would ask the ALJ for a subpoena.  But counsel never informed the ALJ that Providence had not provided the documents, nor did counsel ask the ALJ to issue a subpoena.  Plaintiff's counsel did not act promptly (or indeed at all) to inform the ALJ that Providence had not responded to his sternly worded letter or to advise the ALJ that a subpoena was needed.

   In addition, there is ample evidence in the record of Plaintiff's seizures and

12

noncompliance with medication and treatment to provide a sufficient basis for the ALJ's decision. The ALJ's obligation to "neutrally develop the facts" means the ALJ must obtain additional records when "a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). No crucial issue is undeveloped here.

Accordingly, under the circumstances of this case, the Court find the ALJ did not shirk her duty to fully and fairly develop the record.

### B. The Seizure Questionnaires Completed by Plaintiff's Mother

Plaintiff next argues the ALJ erred by giving little weight to the seizure questionnaires completed by his mother. (Pl.'s Mem. Supp. at 15.) He asserts that the questionnaires were consistent with his mother's testimony and his reports of seizures. (*Id.*) The ALJ explained in her decision that she gave little weight to the questionnaires because the claimed frequency of seizures, particularly three a day, was inconsistent with other evidence, and because Plaintiff's mother did not account for his noncompliance with medication. (R. 17.)

Substantial evidence supports this aspect of the ALJ's decision. As summarized above, Plaintiff's noncompliance with medication is well-supported by the record. Nearly all of Plaintiff's trips to the ED were preceded by seizures, and the seizures invariably occurred when he skipped his medication. More than one provider documented that the single exacerbating factor and the single risk factor for seizures was Plaintiff's noncompliance with medication.

As to the frequency of seizures reported by Plaintiff's mother, that is inconsistent with the seizure questionnaire Plaintiff completed, Plaintiff's treatment records, Dr.

13

Tseng's notation that Plaintiff's seizures were relatively well-controlled, and Plaintiff's mother's report to Dr. Tseng that Plaintiff had 20–30 seizures over his lifetime. According to medical documentation, Plaintiff had more than one seizure a day only when he missed a dosage of his medication.

In sum, the ALJ did not err in giving little weight to Plaintiff's mother's statements about the frequency, intensity, and side effects of Plaintiff's seizures.

### C.    The ALJ's Consideration of Plaintiff's Medication Noncompliance

Plaintiff next challenges the ALJ's consideration of his noncompliance with medication on several fronts.  First, he faults the ALJ for not applying or acknowledging the standard for considering a claimant's failure to follow prescribed treatment set forth in Social Security Ruling (SSR) 18-3p.  (*Id.* at 15–16.)  Under SSR 18-3p, an ALJ must determine whether a claimant has failed to follow prescribed treatment when:

> 1.The individual would otherwise be entitled to benefits based on disability or eligible for blindness benefits under titles II or XVI of the Act;
>
> 2.We have evidence that an individual's own medical source(s) prescribed[] treatment for the medically determinable impairment(s) upon which the disability finding is based; and
>
> 3.We have evidence that the individual did not follow the prescribed treatment.

SSR 18-3p, 2018 WL 4945641, at *2 (S.S.A. Oct. 29, 2018.)  All three conditions must be present before the obligation to determine whether the claimant did not follow prescribed treatment is triggered.  *Id.*

The Commissioner argues that the ALJ was not required to determine whether Plaintiff failed to follow prescribed treatment under SSR 18-3p, because the first

condition was not present.  That is, the ALJ did not find that Plaintiff "is entitled to

disability . . . benefits . . . regardless of whether [he] followed the prescribed treatment."

*See* SSR 18-3p.[5]  SSR 18-3p applies only "where the ALJ finds that a claimant would be

otherwise entitled to disability benefits."  *Brewer v. Comm'r of Soc. Sec.*, No. 2:19-CV-

5200, 2020 WL 7253306, at *7 (S.D. Ohio Dec. 10, 2020) (citation omitted).  In other

words, before SSR 18-3p will apply, the ALJ must find the claimant "would be found

disabled but for his unjustifiable non-compliance with prescribed medical treatment."

*Ginn v. Saul*, No. CV 19-12323, 2020 WL 7890734, at *11 (E.D. La. Nov. 2, 2020), *R. &*

*R. adopted*, 2021 WL 40185 (E.D. La. Jan. 5, 2021).  Because the ALJ did not find that

Plaintiff would be entitled to disability benefits but for his noncompliance with

medication, SSR 18-3p does not apply.

Second, Plaintiff argues generally that the ALJ did not account for his inability to

afford his seizure medication.  The Court disagrees.  The ALJ explicitly acknowledged a

treatment note documenting that Plaintiff said he could not afford to refill his

prescription.  (R. 16.)  Far from establishing that Plaintiff "complied with his medication

---

[5] The full explanation reads:

> We only perform the failure to follow prescribed treatment analysis
> discussed in this SSR after we find that an individual is entitled to disability
> or eligible for statutory blindness benefits under titles II or XVI of the Act,
> regardless of whether the individual followed the prescribed treatment.  We
> will not determine whether an individual failed to follow prescribed
> treatment if we find the individual is not disabled, not blind, or otherwise
> not entitled to or eligible for benefits under titles II or XVI of the Act.

SSR 18-3p.

except when he was unable to afford his medication" (Pl.'s Mem. at 16), the record documents only two or three occasions when Plaintiff said he did not refill his prescriptions because of inability to pay. In addition, other evidence, or lack thereof, detracts from Plaintiff's position. For example, there is no evidence that Plaintiff applied for or was denied financial assistance to pay for prescriptions. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (finding relevant to claimant's assertion that he could not afford medication whether the claimant had "sought any treatment offered to indigents"). Plaintiff also maintained a daily half-pack to a pack-and-a-half cigarette habit, and occasionally drank alcohol and used controlled substances, presumably spending money that could have been used to refill his prescriptions. *See id.* (further finding relevant there was no evidence the claimant "chose to forgo smoking three packs of cigarettes a day to help finance . . . medication"). Finally, medical records reflect that Plaintiff's noncompliance was due mostly to his failure to establish care with a primary care doctor.

Third, Plaintiff suggests the ALJ did not properly consider his alleged inability to pay for medications when the ALJ evaluated his epilepsy at step three of the sequential analysis. Plaintiff points to Listing 11.00(H)(4)(d)[6] of 20 C.F.R. part 404, subpart P, appendix 1, to support his argument. (Pl.'s Mem. at 16.) Listing 11.00(H)(4)(d) describes how seizures are counted:

> We do not count seizures that occur during a period when you are not adhering to prescribed treatment without good reason. When we determine that you had good reason for not adhering to prescribed treatment, we will consider your physical, mental, educational, and communicative limitations (including any language barriers). We will consider you to have good

---

[6] Listing 11.00 provides guidance for all listed neurological disorders, including epilepsy.

16

reason for not following prescribed treatment if, for example, the treatment is very risky for you due to its consequences or unusual nature, or if you are unable to afford prescribed treatment that you are willing to accept, but for which no free community resources are available.

Plaintiff does not focus his argument on how the ALJ counted his seizures, which is what Listing 11.00(H)(4)(d) pertains to, but suggests generally that the ALJ should have considered his alleged inability to afford his prescriptions as a "good reason" for not taking his medications as prescribed.  (Pl.'s Mem. at 16.)

Putting aside the question whether the Court should export a standard for counting seizures to the broader issue of medication noncompliance, Plaintiff's argument is not persuasive because it rests on a faulty premise.  Plaintiff surmises that the ALJ did not consider his financial inability to refill his prescriptions.  To the contrary, the ALJ explicitly referred to a medical record reflecting that Plaintiff did not refill a prescription because he could not afford it.  While there was another mention of unaffordability in the record, "an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).  Although the reference appears at step four of the sequential evaluation (not at step three, where the listings are considered), the Court presumes the ALJ had the complete record in mind throughout the drafting of the decision.  Any failure to mention the record reflecting unaffordability at step three, as well as step four, was no more than a scrivener's error, if even that.  In any event, given the few number of times unaffordability is mentioned in the record, it is likely the ALJ did not consider it a primary reason for Plaintiff's repeated noncompliance.  Substantial evidence in the record as a whole—namely, the lack of a primary care doctor as the

17

reason Plaintiff could not refill his prescriptions—supports the conclusion that Plaintiff's noncompliance was due to factors other than affordability.

As discussed fully above in this section, other substantial evidence undercuts Plaintiff's claim that he was noncompliant with medication because he could not afford to refill his prescriptions.  The Court incorporates that discussion here by reference.

Finally, Listing 11.00(H)(4)(d) contains an important qualification that Plaintiff has overlooked.  A claimant will have a good reason for not following prescribed treatment if he cannot afford it *and* "no free community resources are available."  There is no evidence that Plaintiff sought out resources to help pay for his prescriptions or that free community resources were not available.

### D.    Listing 11.02

At step three of the sequential evaluation, the ALJ determined that Plaintiff's epilepsy did not meet or medically equal Listing 11.02.  Plaintiff contends the ALJ's determination is not supported by substantial evidence in the record as a whole because financial limitations precluded his ability to pay for prescribed treatment.  (Pl.'s Mem. at 17.)  The Court rejects this argument for the reasons discussed above.

Plaintiff next argues that the ALJ did not consider the number of seizures he has had, that he had a seizure in the ED that was witnessed by medical personnel, or that his mother and girlfriend have witnessed the seizures.  (*Id.*)  Plaintiff submits this evidence "more than satisf[ies] the criteria of [Listing] 11.02."  (*Id.*)  Plaintiff focuses his argument on Listing 11.02(A) and (B).  (*Id.*)

Under Listing 11.02(A), epilepsy must be "documented by a detailed description

of a typical seizure and characterized by . . . "[g]eneralized tonic-clonic seizures . . ., occurring at least once a month for at least 3 consecutive months . . . despite adherence to prescribed treatment . . . ."  20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02(A).  Listing 11.02(B) also requires detailed documentation of a seizure and "[d]yscognitive seizures . . ., occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment."  20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02(B).

The ALJ found that Plaintiff did not meet or medically equal Listing 11.02(A) or (B) because he did not meet the frequency requirement of either listing, "*despite adherence to prescribed treatment*."  (R. at 14 (emphasis in original).)  While Plaintiff has identified a number of seizures that were witnesses by medical personnel, his mother, his girlfriend, and others, that evidence has no bearing on whether the seizures occurred despite compliance with prescribed treatment.  To the contrary, Plaintiff's documented seizures occurred almost invariably when he was *not* adhering to prescribed treatment.  A claimant's "repeated failure at following prescribed antiepileptic treatment" is antithetical to his claim that his epilepsy meets or equals Listing 11.02.  *Simmons v. Colvin*, No. 4:15-CV-04055, 2016 WL 2907717, at *3 (W.D. Ark. May 18, 2016).  And Plaintiff's repeated non-adherence cannot be excused by claimed financial limitations, *see* Part III.C., *supra*.

Finally, Plaintiff makes a one-sentence argument that the ALJ did not analyze his impairments in combination at step three.  (Pl.'s Mem. at 18.)  The Court considers this undeveloped argument waived and declines to consider it.  *See Melder v. Colvin*, 546 F. App'x 605, 606 (8th Cir. 2013); *Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir.

2008); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

### E.    Whether the ALJ Failed to Consider Relevant Vocational Expert Testimony

Plaintiff asserts the ALJ erred at step five by not crediting Dr. Mosley's testimony that a hypothetical individual who leaves work after having a seizure and requires the following day to recover could not work competitively.  (Pl.'s Mem. at 18.)  Dr. Mosley's testimony was offered in response to a hypothetical question posed at the hearing by Plaintiff's counsel—not by the ALJ—and incorporating a limitation that the ALJ did not include in Plaintiff's RFC.  (R. at 81–82, 86.)

A hypothetical question must "include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994).  Plaintiff identifies the evidence supporting the limitation incorporated in his counsel's hypothetical as the subjective reports from Plaintiff and his mother that he needed a day to recover after a seizure, his loss of two jobs after having a seizure at work, and his loss of a job after a doctor prescribed him time off after a seizure. (Pl.'s Mem. at 18.)

As discussed above, the ALJ properly gave little weight to subjective evidence from Plaintiff's mother because it was inconsistent with the record and did not account for Plaintiff's noncompliance with medication.  Likewise, the ALJ found that Plaintiff's subjective statements about the intensity, persistence, and limiting effects of his seizure disorder were not consistent with the medical evidence and other evidence of record.  (R. 15.)  Substantial evidence on the record as a whole supports this finding, in particular, the

evidence establishing that nearly all of Plaintiff's seizures occurred when he was not compliant with medication and that his noncompliance was rarely due to financial limitations.  Simply put, if Plaintiff complied with his medication regimen, he would rarely have a seizure at work or need to take time off to recover after a seizure.

Other evidence inconsistent with Plaintiff's claim that he would need a day to recover after having a seizure includes treatment notes of his visits to the ED immediately after having a seizure, which often documented no headache, no dizziness, alertness, no distress, normal sensory functioning, normal motor functioning, and normal speech. (*E.g.*, R. 345, 347, 363, 365, 369, 371, 373, 375, 377, 380, 382, 477.)  On the other hand, Plaintiff was occasionally described as lethargic, fatigued, dizzy, or "not feeling well," and he twice needed treatment for a tongue laceration.  (R. 345, 375, 392, 477, 591.) However, he typically left the ED within a couple of hours, at least twice against medical advice, and did not follow up with recommended treatment or obtaining a primary care provider.  (R. 368, 375, 377, 382, 389, 479.)  No objective medical evidence supports a finding that Plaintiff would need a day off work to recover after having a seizure.

With respect to the loss of employment after having a seizure at work, Plaintiff testified that happened three times: soon after he graduated from high school, in 2016, and in 2018.  These isolated occurrences do not correspond with the monthly seizures at work suggested by Plaintiff's counsel's hypothetical.  (R. 84–87.)  Moreover, there is no evidence that Plaintiff was compliant with his medication at those times.

Regarding Plaintiff's claim that he was fired from a job for taking prescribed time off after a seizure, the only supporting evidence in the record is the Work History Report

21

completed by Plaintiff in April 2016. (R. 248–61.) Plaintiff wrote he was fired as a

cashier at a Casey's gas station on or about November 6, 2015,[7] because "I had a seizure

and doctor gave me days off. So I took my work note in and the manager gave away my

job . . . ." (R. 248, 258.) Contemporaneous documents in the administrative record do

not back Plaintiff's account. There is no evidence in the record that Plaintiff was

prescribed time off work after his seizures on November 2 and 10, 2015. (*See* R. 363–

74.) In addition, records from those dates indicate that Plaintiff was not compliant with

medication.

In sum, Plaintiff's counsel's hypothetical question incorporated limitations that

were not supported by substantial evidence in the record as a whole. Therefore, the ALJ

was under no obligation to accept Mr. Mosley's testimony given in response to that

question.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [ECF No. 16] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [ECF No. 18] be **GRANTED**;

    and

---

[7] The ending date of employment noted on the Work History Report is November 6, *2018*. The Court believes this date should be November 6, *2015*, based on a medical record dated November 10, 2015, indicating Plaintiff worked at Casey's on that date, and considering the date Plaintiff completed the Work History Report (April 20, 2016), which predates November 6, 2018.

3.  Judgment be entered accordingly.

Dated: January 28, 2021

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).